Sneed, J.,
delivered the opinion of 'the court.
These several causes of Branch & Co., Walters, Joiner and Abernathy, -which have been argued and considered together, are proceedings 'by mandamus against the Sinking Bund Commissioner's of the city of Memphis, to enforce the payment of -certain bonds and conpons of the city, held and owned by the relators, respectively, -out of the sinldng fund of s-aid city, in the process of creation under its charier to discharge its bonded debt. The relator Walters, holds two paving bonds of $1,000 each, dated 10th of July, 1868, and due 1st of July, 1873, payable in New York, upon which interest coupons have been paid to maturity. .The relator Abernathy, holds -one bond of $1,000, issued 1st of July, 1852, due and payable 1st of July, 1873, with four coupons of $30 each attached, due respectively, the first Mondays in January and July, 1873, and the first Mondays in January and July, 1874. The relator Joiner *492 bolds two bonds of $J,000, one dated- the 1st of July, 1867, and due tibe first Monday in July, 1872, and tbe other dated tbe 1st of June, 1868, and due tbe 1st of January, 1873. The relators, Branch & Co., hold three bonds of $1,000 each, issued 1st of July, 1868, and due 1st of July, 1873.
On the 4th of June, 1874, the relators, Branch & Co., recovered judgment upon their said bonds, upon which execution issued and was returned nulla boma. The petition of each of the relators alleges a demand npon the city for the payment of their respective demands, and a refusal —also a demand for a levy of taxes for that purpose, a demand that the municipal government require payment thereof by the sinking fund commissioners, and a demand for payment upon the sinking fund commissioners themselves, and a refusal, respectively, ti> each demand. The relators allege also that the city has no property subject to execution; that there is an amount of the sinking fund in the hands of the commisisoners sufficient to pay the amount due each, and that under and by .authority of the charter of said city, the fund was created and established expressly for the payment at maturity of the bonded debt of the city, of which the demands of the relators constitute a part; and that the commissioners aforesaid are using and perverting Said fund to another and different purpose from that contemplated in the charter which authorizes its creation.
The sinking fund commissioners, in their return to the alternative writ of mandamus, say, among other things, that they are under oath and under bond to administer tbe sinking fund as required by the city ordinances, by which it was established under authority of the charter, .and that they cannot he compelled by the writ of mandamus to give it any other or different direction; that the sinking fund must remain intact and perfect during the currency of all the bonds it is designed to retire, and that during all that *493 time it must be and remain in such form 'as ■to produce an income or revenue, to tbe end that the process of retiring the bonds may continue, and that the outstanding bonds may, by the time they have all become due, be retired, and that its appropriation to due debts will be a destruction of the fund, and will prevent and defeat the object of its creation, and tend to injure and defraud the holders- of bonds of the city yet running to maturity, who. have a right to insist upon the provision of an adequate sinking fund to retire the bonds as they mature, and that it will also deprive the city of an easy, certain and effectual mode of discharging its very large bonded debt. They answer further, that 'the charter of the city gives the general council the power to create a sinking fund, and confers upon it the discretion to organize that sinking fund upon such principles as it may seem best calculated to effect the abject intended, to wit: the retiring of the bonds of the city as the same may become due; thait the general council, in pursuance of the power and discretion so conferred upon it, has, by ordinance, created and organized a sinking fund for said purpose, and that all the money that lias come to, or is in the hands of the sinking fund commissioners, has been received and is held subject to the provisions of -the said ordinance, and must be disposed of as therein prescribed. That among other provisions said ordinance specially provides that all the moneys which may come to the hands of said sinking fund commissioners they shall invest in the purchase of -a bond or bonds of the city not yet matured, at the lowest price at which the same can be purchased, for the account of the sinking fund, from time to time, as they shall receive a sum sufficient for that purpose. That the bonds purchased are to be canceled as soon as purchased, as are all the coupons, but the coupons are to he collected as they fall due until the maturity of the bonds, and the proceeds .applied from time to- time to the purchase of other bonds, and the bonds tbus purchased are, *494 as they mature, to be filed with the comptroller as paid.
They aver that under their oath and their bond they are bound to obey and observe all the provisions of the said ordinance, and that they ought not voluntarily, and cannot lawfully, be compelled by mandamus or otherwise, to disregard or violate the same, and that the same ordinance prohibits and prevents the payment by them of the relator’s bonds or tbe application of any of the moneys in the hands or to come to the hands of the sinking fund commissioners, tc the purpose. They further aver that the said sinking fund as at present organized, if properly administered, With a very small rate of taxation, will easily pay off the entire bonded debt of the city by the time or long before the time it matures. It is not disputed that tire city has a bonded debt of s'everal millions outstanding, much of which has twenty-five or thirty years to run, and the bonds have for the most part been negotiated at prices greatly below par.
That provision of the city charter under which the sinking fund was established, is in the following words: “The general council shall have power to lay and collect a special tax, not to exceed one-half percentum, or fifty cents on every one hundred dollars worth of taxable property, for tbe sole purpose of creating a sinking fund to be used in retiring tbe bonds of tbe city as they may become due.” The charter act containing this provision was passed in 1870. The sinking fund under this provision of the charter was 'established in 1872. The ordinance under which it was created, provides:
1. That a tax of twenty cents on the hundred dollars of taxable property be levied fur the sole and special purpose of creating a sinking fund to be used only in retiring the bonds of the city.
2. The tax is to be collected in money, and a separate account thereof be kept by tbe tax collector, .and that it be paid over only in accordance with the oa*dkuance.
*495 3. A provision is made for the appointment of sinking fund commissioners.
4. The commissioners are required to take ’an oath, and enter info bond with security, each in the sum of $10,000, for the faithful administration of said sinking fund, aooord.ing to the provisions of the ordinance.
5. The commissioners are subject to removal from office for violation of the duties imposed by the 'ordinance.
6. The tax collector is required to pay over monthly to the commissioners the sinking fund tax collected during’ the preceding month.
1. The comptroller of the city .treasury is required to •open an account with the sinking fund commissioners, and he shall from time to time charge them with the amounts paid to them by the tax collector, as shown by the receipts filed, and shall credit them with the amounts paid out in the purchase of the bonds of the city purchased by them, as hereinafter directed. ITe shall also charge them with the interest on such bonds of the city as they may purchase from time to time as they may fall due:.
8. As soon as the sinking fund commissioners shall receive from the tax collector a sufficient sum, and from time to time thereafter, as they may receive other sums, either from the tax collector or as bonds purchased, as hereinafter provided, they shall invest the same in the purchase of a bond or bonds of the city not yet matured, at the lowest price at which the same can be purchased, for the account of the sinking fund.
9. At t]ie end of each month the sinking fund commissioners shall make a written statement to the comptroller, which all of them shall sign .and swear to, in which they shall show the amount of money received by them during the month on account of the sinking fund, the amount they have invested in the purchase of bonds of the city, the price at which they purchased the bonds, and the numbers, dates, and issues of the bonds purchased, and the amount of *496 money belonging to the sinking fund remaining in tbeir hands; and the said statement shall he filed and remain in the office of the comptroller. At the time of making the said monthly written statement, the said commissioners shall produce to the comptroller all the bonds of the city they have purchased up to that day, with the conupons belonging thereto, and the comptroller, in their presence, shall cause to be stamped on each bond and 'each coupon these words, “Belonging to the sinking fund of the city of Memphis,” and at the same time shall cancel the bonds and coupons produced, so as to prevent their future negotiation; and before returning the bonds and coupons so stamped and canceled to. tbe sinking fund commissioners, be shall record the same in a book to> be kept by him for the purpose, giving number, date of issue and date of maturity of each bond.
10. The sinking fund commissioners shall retain each and every bond purchased by them after being stamped and canceled as aforesaid, until its maturity; and in the meantime shall collect from the city treasurer or other person paying the same, the coupons on the said bonds SO' purchased from time to time as they respectively mature, and shall apply the money so collected in the purchase of other bonds of the city, in the manner before directed in reference to the money received of the tax collector. As soon as the bonds themselves mature, the sinking fund commissioners shall file them in the office of. the comptroller.
11. No bond or coupon, after being purchased by the sinking fund commissioners, shall be valid in the hands of any other person, but shall be deemed to be canceled 'and paid, and tbe city treasurer and every other officer and agent of the city is hereby expressly prohibited from paying any such bond or coupon, excejit to the sinking fund commissioners as aforesaid, and if any tax collector, or officer, or agent, pay any such bond or coupon, to. any other person, the payment shall not be allowed bim as a credit; *497 and the treasurer, or officer, or agent of the city paying-any such, coupon is hereby required to cut the same from the bond to which it belongs at the time he malíes payment, and the sinking fund commissioners are hereby forbidden to separate the coupons from the bonds for any purpose whatever.
We have thus quoted all that the charter or the ordinance contains necessary to be considered in the determination of this controversy. It will be observed that the ordinance very fully develops the creation of the sinking fund in controversy, as well as the basis and manner of its administration. It is not our province to inquire whether this scheme of finance be the best that could be conceived for the ultimate extinguishment of the bonded debt of Memphis, 'and at the same time the least burdensome to the tax payers of the city. It certainly commends itself for its perspicuous simplicity, and for the cheeks and safeguards with which its authors have hedged it about, by way of guaranty for its faithful administration. If it be true, as asserted by the counsel for the city, that by this scheme the entire bonded debt of the city can be retired and extinguished by the time the last bond now in 'circulation becomes due, without injustice to the creditors of the city, and without any considerable increase of the burdens of the people, then the question swells into one of vast magnitude to the city, as well as to its creditors. But we are to deal with the matter as a question of strict law, 'and no consid-' eration of public policy must be allowed to overshadow the just rights of these .relators under the law. The liabilities of a municipality are in no manner to be assimilated to the debts of an individual or a private corporation, except in the fact that where 'each is alike just, as a matter of ethics and of law, each should be paid to the uttermost farthing. But the necessities of municipal governments, as well as the usages of finance, have given to' the obliga *498 tions of a city government a very different status in the commerce of the country from such as belongs to private obligations. The city operates under its charter for the public good alone. Its charter is the breath of its nostrils. It dares not venture into the domain of speculation. A city bond at a premium, or even at par, has come to be an anomaly in the financial world with most of the cities in this country. Nothing but a corporate purpose alone can call forth its revenues. Its wharves, waterworks, streets, pavements and all enterprises of public utility have to be paid for out of the revenues drawn from the people. If its incomes are inadequate to' its necessities, and it have authority in its charter to do so, it is driven to the necessity of issuing its bonds at long or short time, as the exigency demands. This necessity of itself must be taken as an evidence of financial embarrassment which necessarily affects the value of its bonds when put upon the market. But a prompt semi-annual payment of interest invites a market for the bond at perhaps half its nominal value. Thus a municipal obligation of one thousand dollars, at thirty years' time, negotiated at half its nominal value, and drawing semi-annual instalments of interest at six per cent, on its face value, will more than triple its principal before maturity, and upon the small investment, yield an increase that would seem tO' throw doubt upon the infallibility of figures.
Thus it is, when a state or a municipality has its millions cn the market, it becomes necessary as a protection, both to the creditor and the people, that -some scheme may be devised by which the creditor may be secured without oppression to the people. The state and the municipality alike are obliged, now and then, to anticipate their revenues and to incur lalrge debts'. It then becomes a problem for the statesman to concoct a plan of payment, satisfactory alike to the constituency and the. creditor. In the consideration ■of the question, it becomes necessary to trace very briefly *499 tbe history, origin and character of sinking funds in this and other countries. The borrowing of money for ordinary and extraordinary expenses is an immemorial practice with nations, states and municipalities. When public debits were approximating maturity, without ability to pay, the system of funding was resorted to, as an expedient to secure the creditor’s forbearance, 'and at "the same time postpone the evil day of onerous taxation.
The plan of funding the public debt is not of modem conception, but originated in Venice, in the twelfth century; and it is stated as an interesting historical fact that out of this system ultimately grew those great corporations, the Bank of Venice and the Bank of England.
The system, though in some respects objectionable, enables the state or the city to spread over many years the taxation which would press too severely on one. But it made no provision for the payment of the principal of the debt. It is a sound principle of political economy as well as of morals, that where debts are to be paid by taxation, no debt ought to be created unless the act of its creation be accompanied by the initiation of a special fund, to run with it in point of time pari passu, with ia view to its ultimate payment. To this end the expedient of a sinking fund was first conceived in England, in 1716, by tbe Earl of Stanhope.
A certain portion of the annual revenues was set apart for the gradual payment of the national debt. After new loans in 1728, tbe sinking fund was charged with the interest of the loan, and the additional taxes imposed for the payment of the interest of the loans, were applied directly to that fund. Other plans were afterwards put in operation, but the plan most nearly alike the plan involved in this controversy, was submitted in 1771. It was simply tbe 'application of a certain sum of money annually set apart from the rest of the revenues, and appropriated for the purchase of stock at current prices; the interest of the *500 part of tbe debt thus redeemed being always added to tbe original sum, to increase tbe operation of tbe fund; and this system to be inviolably followed in pe'aoe and war.
To secure the steady execution of this plan, the management of the fund was to be committed to- special commissioners, acting under penalties, in such manner as would take it out of the bands of the treasury, and form a check upon the House of Commons itself. The theory was, that any surplus of national revenues above the national expenditures, will be sufficient, if it continue for a long time and be faithfully applied, to discharge any national debt, however great. That money bearing compound interest, though increasing at first slowly, yet the rate being continually accelerated, becomes in time so rapid 'as to mock all the powers of imagination. Hamilton, on the National Debt of England, 80, 100. Whatever the system may he in England sine© the national debt has become a sort of perpetuity, and loans have become payable at the option of the government, these were the general features of the system when England borrowed money, as we do here, for fixed periods. The early settlers of this country brought with them from England, not only her system of laws, but her system of finance-; and the modifications to- which both have been subjected, are only such as made it necessary to adapt them to- -the democratic institutions of this country. The law in this country -has impressed upon the term “sinking fund,” a fixed, technical signification. It is a fund arising from particular taxes, imposts or duties, which is appropriated towards the payment of the interest due on a public debt, and for the “gradual payment of the principal.” 2 Bouv. L. D., 524 [“Sinking Fund,” 15th ed., p. 642]. When the term sinking fund is used in a statute it must be understood to- have -been used in its technical sense. The mode of administering the fund in this ease is not specially prescribed. Its creation is the declaration of a trust in behalf of -all the creditors, for whose indem *501 nity it is intended. If the ‘trust so declared be not only for the payment of interest, but for the “gradual payment of the principal,” it must- follow that the fund, is to be inviolable until the purposes of its creation be accomplished; and it must follow, also, that its managers are intrusted with a large share of discretion in so wielding it as to make it sufficiently productive to accomplish the objects of its creation. For it is in contemplation of law just what its name imports, a fund into which the debt provided for, is to be ultimately sunken and absorbed. It has been generally understood in this country to' be a trust fund set apart for the gradual absorption of the public debt; and the recognized process has been for the manager or trustee to invest and reinvest the fund as it accrues, in bonds due or not due, in his discretion, at the lowest market price. U. S. Rev. Statutes, secs. 3694, 3695, 3696. Act 1842, ch. 180, Nich. Supp., 42, 43; Board of Liquidation v. Municipality, 6 La. An., 21; Act 1838, ch. 107, sec. 26; Nich. Supp. 32; Act 1835, ch. 22; Nich. & Car. Rev., 408, 409.
In view of these general propositions, what did the lawmakers mean by that provision of the charter of Memphis, whch authorized the city government to set apart a certain portion of its revenues for the sole purpose of creating a sinking fund, to be used in retiring the bonds of the city as they may become due? Does the charter mean that before the whole debt matures, each several creditor, as his -bond becomes due, may demand its payment- out of the sinking fund? Or does it mean that the fund is created for all bond creditors alike, and that its productive energies are to remain intact, until all the bonds are due or.retired, and that, in the meantime, its managers are special trustees for all the creditors, to whom a discretion is confided, as to the best time and manner of investing the fund, in respect to the fluctuation of values, SO' as to make it most productive? If the first hypothesis be true, then the trust fails,/ and the sinking fund is emasculated and destroyed; and i *502 this ware a quia timet bill by the holders of the undue bonds of the city to assert tbe trust, and to enjoin the present proceeding, the equities of the complainants would appeal most powerfully to the conscience of a court of equity. It will be observed, however, that the charter authorizes, in general terms, the creation of a sinking fund to be used in retiring the bonds of the city as they may become due; not in paying each particular bond as it may become due; but in retiring the bonds as they may become due. In the construction of statutes it is a general rule that where its provisions are general, everything which is necessary to malte such provision effectual is supplied by the common law. Coke, Litt., 235; 2 Coke Inst., 222; Bac. Ab., Stat, B. And when a power is given by statute, everything necessary to malte it effectual is given by implication. 12 Oolte, 130.
When the charter confers the power tO' create a smiting fund in general terms without more, the common law comes to its aid, and defines what is meant by sinking fund —a portion, of the public revenues set apart to pay the interest on the city debt and gradually to discharge the principal. The words, gradually to discharge the principal, are very significant here of the discretion claimed by the defendants in the management of their trust.
The words super-added, “to be used in ’’ retiring the bonds of the city as they become due, give, in our judgment, still greater certainty to what we conceive to be the proper construction of this charter. If it had been intended to pay off and discharge any of the due city bonds on presentation, before all became due, then the lawgivers have been singularly unfortunate in the use of terms. The word “retiring” a bond, as understood in financial parlance in this country, does not mean payment, redemption or discharge, but its peculiar import, when applied to such securities, is a withdrawal from circulation, and we think the use of this word furnishes a most trust *503 worthy key for the interpretation of this provision of the charter.
If anything more than a “retiring” had been meant, certainly the author of this charter could have fallen upon some plain and unambiguous phrase of our redundant English tongue to have expressed i,t.
First, then, we have the creation of a sinking fund, which, of itself, is a term of technical import, and means, in our judgment in this case, an inviolable trust fund, not for the present redemption of a fraction of the city debt, but for the ultimate redemption of the whole of it; and next we have the mandate of the charter, that- the bonds, shall be “retired,” a phrase singularly appropriate to the very scheme of finance, adopted by the city ordinance. We hold that the ordinance is in no respect repugnant to the charter. It certainly could not have been contemplated by the charter, that these commissioners, in undertaking to build up a trust fund, which, by its gradual accretions, was intended to discharge the whole city debt, should employ their time iu the long series of years that intervened before the debt matured, in “weaving the web of Penelope” — undoing to-day wbat they had done yesterday.
The usual office of the writ of mandamus is to compel executive and ministerial officers to perform official duties appertaining to their offices, where an individual has a private and pecuniary interest in such performance. The People v. Mead, 24 N. Y., 119. Put where a party invokes this extraordinary remedy he must show himself clearly entitled to it. -Por in mandamus oases the relator must stand upon the strict law. 6 Hum., 494. It issues only where there is a clear and specific legal right to be enforced, or a duty AA'hich ought to be and oan be performed, and where there is no other specific and adequate legal remedy. The light which it is sought to protect must therefore he clearly established, and the writ, is never granted in doubtful *504 oases. To a certain extent it is dependent upon the exercise of a sound judicial discretion, and is not grantable as of absolute right in all cases. State v. Supervisors of Washington; 2 Chand., 250; Free Press Association v. Nichols, 45 Verm., 7; People v. Solomon, 46 Ill., 419; People v. Mayor of Chicago, 51 Ill., 28; High Ex. L. R., secs. 6, 9.
If any reasonable doubt exists as to the question of discretion or want of discretion in an officer, the courts will hesitate to interfere, preferring rather to extend the benefit of the doubt in favor of the officer. State v. Warmoth, 23 La. An., 76. And it is a sound rule of law, that where great injury is to result from the invocation of this extraordinary remedy, the courts will refuse it, especially in doubtful cases, and where other remedies are open to the relator.
Thus it was held, that when the holder of county orders was entitled to judgment against the county, he must pursue that remedy, and is not entitled to the writ of mandamus. And the rule is not affected by the fact that the county' has no, property out of which the judgment could be satisfied. In such cases, it is said that the law affording the claimant a plain and adequate remedy by which his claim may be adjudicated and the amount due be ascertained, the ability of the debtor to pay is not a legitimate subject of inquiry, on a proceeding for mandamus. State v. County Judge of Floyd, 5 Iowa, 380; High Extr. L. R., sec. 340; People v. Clark Co., 50 Ill., 213. We quote these authorities from the books, ipsissima verba, but recite this latter ruling to illustrate the extreme jealousy with winch the courts regard this extraordinary remedy, .and not to sanction the intimation, if there be such, that the writ of mandamus does not lie to compel an assessment of taxes by a county, to pay a lawful and ascertained demand, whether by judgment or otherwise.
Under the principles of this opinion, we hold that the *505 sinking fund of the city of Memphis, as created under the charter in question, is an inviolable trust fund for the indemnity of all the bond creditors of the city. That it was intended to be administered in the sound discretion of the city government in such manner as to produce that result, and that the courts have no power to control that discretion, unless it be in a clear case of an abuse and perversion of the authority vested under the charter.
Let the judgment be reversed and the several petitions for mandamus dismissed.